**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**DELORES J. BERRY, widow of
NOLAN K. BERRY,**

      **Plaintiff,**

**v.**                                     **Case No.: 3:10-cv-00430**

**MICHAEL J. ASTRUE,
Commissioner of the Social
Security Administration,**

      **Defendant.**

<u>**MEMORANDUM OPINION**</u>

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Claimant's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. This case is presently before the Court on the parties' cross motions for judgment on the pleadings as articulated in their briefs. (Docket Nos. 9 and 11). Both parties have consented in writing to a decision by the United States Magistrate Judge. (Docket Nos. 4 and 5).

The Court has fully considered the evidence and the arguments of counsel. In conducting its review, the Court identified certain deficiencies in the written opinion of the ALJ, which are more fully addressed in Section VII, Part A *infra.* However, having carefully scrutinized the evidence of record, the Court finds that the final decision of the Commissioner is supported by substantial evidence and should be affirmed.

## I.   <u>Procedural History</u>

The Court observes that the disability claims in the present action have traversed a long procedural trail, which includes three administrative hearings and decisions, two court-ordered remands, and three civil actions.  At each stage, the issues in dispute have diminished, so that all that remains for this Court to consider is the soundness of the Commissioner's decision regarding the severity of the claimant's mental impairments during the three year period between February 27, 1999 and February 13, 2002.  The Court summarizes the procedural history as follows.

Plaintiff Delores J. Berry's decedent, Nolan K. Berry (hereinafter "Claimant"), protectively filed applications for DIB and SSI on November 5, 1999, alleging that he had been disabled since February 27, 1999,[1] due to "[s]pur on spine" and "a lot of pain in back and legs." (Tr. at 46, 47-49, 50, 224-225, and 59). The Social Security Administration (hereinafter "SSA") denied the claims initially and upon reconsideration. (Tr. at 32-36 and 38-40). Claimant requested an administrative hearing, which was conducted on May 18, 2001 by the Honorable Timothy Pace, Administrative Law Judge.  (Tr. at 41 and 237-270). By decision dated August 3, 2001, Judge Pace determined that Claimant could perform "sedentary" work with additional limitations, but that he could work as a packager, production inspector, and television monitor, all of which existed in significant numbers in the national economy.  Therefore, he was not disabled under the Social Security Act.  (Tr. at 12-20). The Appeals Council thereafter denied Claimant's request for review. (Tr. at 4-5). After exhausting his administrative remedies, Claimant filed a civil action, and this Court remanded the case

---

[1] Claimant initially alleged an onset date of April 10, 1999 (Tr. at 47 and 224), but amended his onset date to February 27, 1999. (Tr. at 50).

to secure additional evidence as to Claimant's mental condition; in particular, his major depression as outlined by his psychiatrist. (Tr. at 708). *Berry v. Barnhart*, Civil Action No. 3:02-00301 (S.D.W.Va. 2002); (*see also* Tr. at 328-335). A remand hearing was conducted by William H. Gitlow, Administrative Law Judge, on March 17, 2005. (Tr. at 298-327). By decision dated June 29, 2005, Judge Gitlow determined that Claimant could perform "light" work with additional limitations and could work as a night guard, inspector, assembler, and surveillance monitor. Accordingly, he was not eligible for DIB or SSI. (Tr. at 281-293). Thereafter, the Appeals Council denied review. (Tr. at 271-273).

On December 21, 2005, Claimant filed a second action in this Court. (Tr. at 765-773); *Berry v. Astrue*, Civil Action No. 3:05-01170 (S.D.W.Va. 2005). Nine days later, Claimant was killed in a motor vehicle collision; his wife was substituted as Plaintiff and real party in interest in his civil action. *Berry v. Astrue*, Civil Action No. 3:05-01170 (S.D.W.Va. 2005) (Docket Nos. 14 and 16). In evaluating the final decision of the Commissioner, the Court found that that the explicitly stated purpose of the May 2003 remand Order was to secure additional evidence concerning Claimant's psychiatric condition and was not an invitation for the ALJ to reevaluate the findings relative to Claimant's physical impairments. (*Id.* at Docket No. 19). Therefore, considering the AJL's determination in the 2001 decision that Claimant was capable only of "sedentary" work, the Court concluded that Claimant would be disabled pursuant to Rule 201.09 of the medical-vocational guidelines as of February 14, 2002, the day that he reached 50 years of age. (*Id.*). Based on this finding, the Court reversed the Commissioner's decision, awarded Claimant benefits beginning February 14, 2002, and remanded the case for further proceedings with respect to the time period from April 10, 1999 to

3

February 13, 2002. [2] (*Id.*).

Following a remand hearing, Judge Gitlow determined by decision dated September 28, 2009 that Claimant was not under a disability from the date of his alleged onset, February 27, 1999, through February 13, 2002. (Tr. at 790-806 and 717-728). The Appeals Council declined review. (Tr. at 710-713). Plaintiff thereafter instituted the instant civil action on April 1, 2010 seeking judicial review of Judge Gitlow's decision pursuant to 42 U.S.C. §405(g). (Docket No. 1). The Commissioner filed an Answer and a Transcript of Administrative Proceedings, and both parties filed their Briefs in Support of Judgment on the Pleadings. (Docket Nos. 7, 8, 9, and 11). Consequently, the matter is ripe for resolution.

## II.   <u>**Summary of ALJ's Decision**</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. See *Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. 423(d)(1)(A).

The Social Security Regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520, 416.920. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the

---

[2] The Order mistakenly references Claimant's original alleged onset date of April 10, 1999, rather than his amended onset date of February 27, 1999. However, on remand, the ALJ correctly considered the period of February 27, 1999 through February 13, 2002 (Tr. at 717).

claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to produce evidence, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. *Id.* §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review." 20 C.F.R. § 404.1520a. First, the SSA evaluates the claimant's pertinent signs, symptoms,

and laboratory results to determine whether the claimant has a medically determinable mental impairment. If such impairment exists, the SSA documents its findings. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the SSA compares the medical findings about the severe impairment and the rating, degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. 20 C.F.R. § 404.1520a(d)(2).  Finally, if the SSA finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's mental residual functional capacity. 20 C.F.R. § 404.1520a(d)(3).

In this particular case, Judge Gitlow (hereinafter the "ALJ") determined as a preliminary matter that Claimant met the insured status requirements of the Social Security Act through March 1, 2004. (Tr. at 720, Finding No. 1). At the first step of the sequential evaluation, the ALJ found that Claimant had not engaged in substantial gainful activity since February 27, 1999, the alleged disability onset date.  (*Id.,* Finding No. 2). Turning to the second step of the evaluation, the ALJ determined that Claimant had the severe impairments of low back and neck pain, diabetes mellitus, obesity,

6

hypertension, shortness of breath, depression, anxiety, and borderline intellectual functioning. (*Id.*, Finding No. 3). The ALJ noted that per the order of the District Court, he was to adopt the 2001 physical RFC finding and only evaluate the Claimant's mental impairments in his decision. (*Id.*). Under the third inquiry, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (*Id.*, Finding No. 4). The ALJ assessed Claimant's RFC as the following:

> [C]laimant had the exertional capacity to lift 10 lbs. occasionally, 5 lbs. frequently; sit or stand at will; with periods of standing and walking. Nonexertionally the claimant was not to bend, squat, stoop, push, pull, and not to walk on surfaces which are not level. He was to avoid excessive dust, fumes or gases; or excessive temperature extremes. He read at 4th grade level; and performed math at the 7th grade level. He had a fair ability (ability to function in this area is limited but satisfactory) to relate to co-workers; deal with the public; use judgment; deal with work stresses; function independently; maintain attention and concentration; understand, remember, and carry out detailed, but not complex job instructions; behave in an emotionally stable manner; and relate predictably in social situations. He had a poor ability (ability to function in this area is seriously limited but not precluded) to understand, remember, and carry out complex job instructions.

(Tr. at 722, Finding No. 5). As a result, the ALJ concluded that Claimant could not return to his past relevant employment as a diesel mechanic or truck driver, considered heavy skilled work and medium to heavy semi-skilled work, respectively. (Tr. at 726, Finding No. 6). The ALJ considered that Claimant was 49 years old on the alleged disability onset date,[3] which is defined as a "younger individual" aged 18-49 in 20 C.F.R. 404.1563 and 416.963, that he had a limited education, and could communicate in English. (*Id.*, Finding Nos. 7 and 8). The ALJ concluded that transferability of job skills

---

[3] Claimant was actually 47 years old on his alleged onset date and 49 years old on the final day of the relevant time period.

was not an issue under 20 C.F.R. 404.1568 and 416.968.[4] (*Id.*, Finding No. 9). Accordingly, based on the testimony of the vocational expert, the ALJ found that Claimant could make a successful adjustment to other work that existed in significant numbers in the national economy, such as machine tender, bench assembler, security systems monitor, and document scanner. (Tr. at 726-727, Finding No. 10). Consequently, the ALJ denied benefits. (Tr. at 727).

## III.    Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying Claimant's applications for benefits is supported by substantial evidence. In *Blalock v. Richardson*, 483 F.2d 773 (4th Cir. 1972), substantial evidence was defined as the following:

> Evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Blalock v. Richardson, *supra* at 776, quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).  The decision for the Court to make is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart,* 434 F. 3d 650,653 (4th Cir. 2005), citing *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 2001).

Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453 (4th Cir. 1990). The Court will not re-weigh conflicting evidence or substitute its judgment for that of the Commissioner. *Id.*

---

[4] The Medical-Vocational Rules supported a finding that he was not disabled regardless of whether he had transferable job skills.

However, the Court must not "escape [its] duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch,* 495 F.2d 396, 397 (4th Cir. 1974). The ultimate question for the Court is whether the decision of the Commissioner is well-grounded, bearing in mind that "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner]." *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987).

## IV.   Claimant's Background

Claimant was 47 years old on the date of his alleged disability onset and 49 years old on the final date of the period under consideration in the ALJ's decision. He completed the ninth grade in regular education classes and later finished vocational training in arc welding. (Tr. at 65). His prior work experience included employment as a diesel truck mechanic, a semi-truck driver, and a coal loading operator. (Tr. at 72-78). Claimant was able to read and write in English and perform basic mathematics. (Tr. at 304-305).

## V.   The Medical Evidence

The Court has reviewed the medical records and briefly summarizes the pertinent evidence below. The discussion is limited to records reflecting Claimant's mental health from the date of his alleged onset of disability on February 27, 1999 through February 13, 2002, the date preceding his fiftieth birthday.[5]

### A.   Treatment Records

On July 17, 2000, Claimant contacted St. Mary's Medical Center asking to be evaluated for depression, reporting that he "gets angry-irritable around [his]

---

[5] This period of consideration is hereinafter referred to within this Opinion as the "relevant time period."

grandchildren" and considered "wrecking" his vehicle so that his wife would collect the insurance money. (Tr. at 121). Claimant was referred to Prestera Center Mental Health Services, Inc. ("Prestera") where he began treatment in on July 21, 2000. (*See* Tr. At 708). He was initially prescribed the antidepressant medication Sinequan.[6] (Tr. at 223). Although he reported no side effects from taking Sinequan, he continued to experience difficulty sleeping, so on March 1, 2001, Claimant was prescribed an additional medication, Seroquel.  Seroquel is an "add-on treatment to an antidepressant for patients with Major Depressive Disorder (MDD) who did not have an adequate response to antidepressant therapy."[7] (Tr. at 222, 221). On May 4, 2001, Claimant was assessed as "fairly stable," but continued "to report sleep problems" and that he was "depressed occasionally." (Tr. at 449). On August 2, 2001, Claimant's psychological condition again was considered stable; his hostility and irritability appeared to have decreased, his mood appeared euthymic, and he reported improvement in sleep. (Tr. at 448). On September 27, 2001, Claimant stated that he was feeling anxious and depressed, but that he was "doing good."  He was started on Prozac.  (Tr. at 447). On November 21, 2001, Claimant complained that his chronic pain was interfering with his daily activities, although he presented with improvement in mood.  (Tr. at 446).  On that same day, Claimant saw his supervising psychiatrist, who performed a mental status evaluation and decided to increase Claimant's dosage of Prozac in view of his depressive symptoms. (Tr. at 445).

On December 10, 2001, a written recording of a phone message indicates that Claimant was discharged from St. Mary's Medical Center following an accidental overdose from blood pressure medication. (Tr. at 600). On December 13, 2001,

---

[6] http://www.pfizer.com/files/products/uspi_sinequan.pdf

[7] See http://www.seroquelxr.com

Claimant presented to Prestera and reported that he was "feeling somewhat depressed" and needed a medication adjustment. (Tr. at 444).

On January 9, 2002, Claimant continued to report in his session at Prestera that he was feeling depressed and hopeless, because of the changes in his life style; he denied suicidal ideation, but indicated that at times, he felt that life was not worth living. (Tr. at 441). His dosage of Prozac was increased from a weekly dose to three doses of 10 milligrams per day, and he was also prescribed the antidepressant Remeron to be taken nightly. (*Id.*).

On January 23, 2002, Claimant's wife reported that Claimant had moved out of their home and was living with another woman, whom he had been seeing for a long time. (Tr. at 437-438).  His wife added that Claimant had initially come to Prestera in order to help him get disability benefits; however, she acknowledged that he probably was depressed and anxious. *Id.*  At his counseling session that day, Claimant showed no evidence of psychosis, but his mood was depressed, he felt hopeless, saw no future, and reported that he did not "care anymore." (*Id.*). Claimant became irritable when asked about suicidal ideation and refused in-patient treatment. (*Id.*). He reported that his mood actually had improved since he left his wife. (Tr. at 438).

On January 29, 2002, Claimant stated that he was feeling better since moving out of his house and that he had not felt happy like that for a long time. (Tr. at 436). His mood was calm and his affect much brighter as compared to his previous session. (*Id.*). He was smiling and laughing during the session and indicated that he was looking forward to his life and did not want to go back to his wife. (*Id.*). Claimant was continued on his treatment plan of 30 milligrams per day of Prozac, 15 milligrams per day of Remeron, and individual therapy. (*Id.*).

11

On the final day of the relevant period, the day before his fiftieth birthday, Claimant reported that he was feeling better since he "started back" on Prozac. (Tr. at 435). He had improved energy levels, no suicidal thoughts, and was less depressed. (*Id.*). His mood was noted to be calm. His dosage of Prozac was increased to 50 milligrams because Claimant reported his previous dosage was helping, but not as much as before; he was also prescribed Zyprexa in the amount of 10 milligrams per day. (*Id.*).

### B.   Letters from Treating Psychiatrists

On December 13, 2001, Martin Khan, M.D., a psychiatrist at Prestera, wrote a letter to the Department of Health and Human Resources (DHHS) stating that Claimant was being treated at the facility, that he required treatment for a minimum of one year and would be unable to maintain employment during that time, and that in one year, it would be necessary to reevaluate his capability to seek gainful employment. (Tr. at 709).

In a letter to the SSA dated January 16, 2002, Sohail Rana, M.D., Claimant's then treating psychiatrist at Prestera, wrote that Claimant had been treated since July 21, 2000 for Major Depression, severe, without psychotic features, and that the onset of his mental health problems appeared to be attributed to a work injury which prevented him from maintaining employment. (Tr. at 708). Claimant was currently reporting some improvement in mood and sleep, but continued to present with a depressed mood, poor sleep, anxiety, irritability, feelings of worthlessness/hopelessness, and suicidal ideation without a plan. (*Id.*). Dr. Rana stated that Claimant had confessed to attempting suicide by taking an overdose of prescription medication, but was discovered by his wife and taken to St. Mary's Psychiatric Unit. (*Id.*). In addition, his medical problems appeared to have significantly impaired his mental health. (*Id.*). Dr. Rana stated that "[a]t this time, [Claimant] is unable to maintain employment as a result of impairment in both

physical and mental health" and that "[d]ue to the chronic nature of his disability, prognosis is poor." (*Id.*). She further requested that Claimant's application for disability be processed as quickly as possible. (*Id.*).   On December 7, 2004, Dr. Rana wrote another letter, stating that Claimant had been unable to participate in any employment related activities for the past four years and this condition was expected to continue for the next six months. (Tr. at 706).

### D.   State Agency Assessments

On June 29, 2004, psychologist David E. Frederick, Ph.D. completed a consultative evaluation of Claimant at the request of Disability Determination Services (hereinafter "DDS"). (Tr. at 365-371). On a Wechsler Adult Intelligence Scale III ("WAIS-III"), Claimant received a verbal IQ score of 70, a performance IQ score of 85, and a full scale IQ score of 75. (Tr. at 367). On a Wide Range Achievement Test 3 ("WRAT3"), Claimant tested at the fourth grade level in reading, the third grade level in spelling, and the seventh grade level in arithmetic. (*Id.*).   The scores were deemed to have internal validity "because the difference between the VIQ and the PIQ is indicative of poor education and the spread among subtest scores is not statistically significant." (*Id.*).   Dr. Frederick interpreted Claimant's test results to reflect borderline intellectual functioning.   Claimant's judgment and concentration were assessed as moderately deficient; and his memory recall was within normal limits from immediate to remote. (Tr. at 368).

On November 10, 2004, Richard Cohen, M.D., responded to a list of interrogatories posed by the ALJ concerning Claimant's mental condition since his alleged onset of disability on February 27, 1999. (Tr. at 457-459). Dr. Cohen opined that Claimant did not meet any of the mental disorders Listings. (Tr. at 463). He found that

13

Claimant suffered from 12.04 major depression with anhedonia, sleep disturbance, appetite disturbance, decreased energy and concentration, suicidal ideation with one attempt in the past, and auditory hallucinations; as well as 12.06 anxiety disorder NOS; and borderline intelligence. (*Id.*). Nevertheless, Dr. Cohen found that Claimant did not meet the "B-criteria" because his activities of daily living (activities of daily living) were only mildly impaired; his social functioning was moderately impaired; his concentration, persistence, and pace were moderately impaired; and he had minimal episodes of deterioration or decompensation for extended periods of time. (*Id.*). Dr. Cohen also found that Claimant did not meet the "C-criteria." (*Id.*).

On the same date, Dr. Cohen completed a medical assessment of ability to do work-related activities (Mental) form. (Tr. at 460-462). On a scale of unlimited, good, fair, poor, and none, he assessed that Claimant had a "good" ability to follow work rules, interact with supervisor(s), and function independently; and a "fair" ability to relate to co-workers, deal with the public, use judgment, deal with work stresses, and maintain attention/concentration. (Tr. at 460). Further, Claimant had a "poor" ability to understand, remember, and carry out complex job instructions; a "fair" ability to do the same concerning detailed, but not complex job instructions, and a "good" ability to do the same concerning simple job instructions. (Tr. at 461). He had a "good" ability to maintain personal appearance and demonstrate reliability; and a "fair" ability to behave in an emotionally stable manner and relate predictably in social situations. (*Id.*). Dr. Cohen believed that Claimant was capable of doing at least simple repetitive tasks in a low stress setting with limited social interaction. (Tr. at 462).

14

On December 10, 2008, Pamela Tessnear, Ph.D., rendered a medical opinion for the relevant time period.[8] (Tr. at 778-782). Dr. Tessnear opined that Claimant did not suffer from an impairment or combination of impairments that met or equaled a listed mental disorder. (Tr. at 780). She stated that the medical evidence indicated that Claimant had intellectual limitations and suffered from depression and anxiety. (*Id.*). His anxiety symptoms were mild and variable and were not the focus of treatment. (*Id.*). His depression was reviewed with respect to Listing 12.04; he appeared to have mild limitations in activities of daily living; mild to moderate limitations in social functioning; mild limitations in concentration, persistence, or pace; and no evidence of repeated episodes of decompensation; likewise, the record did not provide evidence of Part C requirements. (Tr. at 781-782). Dr. Tessnear also considered Claimant's intellectual limitations under Listing 12.05. (Tr. at 782). Noting Claimant's 2004 IQ scores, Dr. Tessnear agreed with Dr. Frederick that borderline intellectual functioning was the appropriate diagnosis, rather than mild mental retardation, because of the significant discrepancy between his verbal IQ score of 70 and performance IQ score of 85.  She indicated that such variance in scores was often reflective of a learning disability. (*Id.*).  Dr. Tessnear opined that Claimant likely would have tested within the borderline intelligence range during the relevant time period, as IQ scores are relatively stable over time. With regard to work-related functional limitations, she found that Claimant's abilities were limited, but satisfactory in most areas. (*Id.*).

---

[8] The Court's April 4, 2008 remand order questioned the ALJ's reliance on what it deemed to be inconsistent medical expert conclusions that found Claimant was "moderately" limited in the "B" criteria of social functioning and concentration, persistence, and pace, yet was deemed to have only a "fair ability" in the mental RFC areas involving social functioning and concentration, persistence, and pace and a "poor" ability in understanding, remembering, and carrying out complex instructions. (Civil Case No. 3:05-01170, Docket No. 19 at 8-9). The ALJ, therefore, solicited Dr. Tessnear's opinion as additional evidence, directing her to explain her answers so the Court would understand why she made her assessments, particularly if she found Claimant to be "moderate" in a "B" criteria and "fair" in the corresponding area of the mental RFC.

Dr. Tessnear also completed a medical assessment of ability to do work-related activities (Mental) form. (Tr. at 783-785). Like Dr. Cohen, Dr. Tessnear assessed that Claimant had a "good" ability to follow work rules and interact with supervisor(s) and a "fair" ability to relate to co-workers, deal with the public, use judgment, deal with work stresses, and maintain attention/concentration; however, she opined that he had a "fair" ability, as opposed to Dr. Cohen's assessment that he had a "good" ability, to function independently. (Tr. at 783). Also in line with Dr. Cohen, Dr. Tessnear found that Claimant had a "poor" ability to understand, remember, and carry out complex job instructions; a "fair" ability to do the same concerning detailed, but not complex job instructions, and a "good" ability to do the same concerning simple job instructions. (Tr. at 784). Finally, Dr. Tessnear made the same finding as Dr. Cohen that Claimant had a "good" ability to maintain personal appearance and demonstrate reliability; and a "fair" ability to behave in an emotionally stable manner and relate predictably in social situations. (*Id.*).

## VI.   <u>Plaintiff's Challenges to the Commissioner's Decision</u>

Plaintiff presents three interrelated challenges to the decision of the Commissioner. Specifically, Plaintiff argues that the ALJ erred in (1) not finding that Claimant's impairments in combination equaled a Listed Impairment, (2) assessing Claimant's credibility as "less than good," and (3) weighing the opinion evidence from non-examining agency experts more heavily than that from Claimant's treating psychiatrists. (Pl.'s Br. at 9-11).

In response, the Commissioner argues that substantial evidence supports the ALJ's analysis of the Listings, his treatment of the opinion evidence, and his credibility determination.  (Def.'s Br. at 11-18).

16

## VII.   **Analysis**

### A.      **Listed Impairments**

Plaintiff's first argument catalogs a list of Claimant's conditions and pronounces that "Claimant's physical and mental impairments in combination obviously equal a listed impairment." (Pl.'s Br. at 6). The Court rejects this conclusory statement.  Plaintiff does not provide any argument in support of her assertion and fails to identify a listing which Claimant's combined impairments purportedly meet or equal. Further, the Court finds that the ALJ's determination at the third step of the sequential evaluation is supported by substantial evidence. The ALJ examined the criteria of the three listed mental disorders that most closely correlated with Claimant's symptoms, concluding that Claimant's impairments did not meet or equal the functional limitations contained in the "paragraph B" or "paragraph C" criteria of Listings 12.04 (Affective Disorders) and 12.06 (Anxiety-related Disorders), or the diagnostic description of Listing 12.05 (Mental Retardation). The Court finds no insufficiencies in the ALJ's analysis of Listings 12.04 and 12.06, or the corresponding written explanation of his findings.  The Court does appreciate shortcomings in the ALJ's written explanation of his 12.05 analysis, but finds these inadequacies to be harmless inasmuch as the ALJ's ultimate decision has substantial evidentiary support.[9]

At the third step of the sequential evaluation, the ALJ considers whether a

---

[9] It is important to note that Plaintiff does not dispute the diagnosis of borderline intelligence or argue that Claimant was more appropriately diagnosed with mental retardation.  None of Claimant's treating physicians or psychiatrists ever suggested such a diagnosis.  In addition, the Court is cognizant that the ALJ previously addressed the question of whether Claimant had borderline intelligence versus mild mental retardation.  In his prior written decision, the ALJ acknowledged that a score of 70 fell within the severity range of 12.05, but discounted that score and expressly agreed with the expert opinions that the solitary verbal IQ score of 70 was a reflection of Claimant's limited education and not an indication of mild mental retardation.  (Tr. at 284).  That the ALJ reviewed and relied upon his prior written decision on certain points is indisputable and is demonstrated in his discussion of Claimant's depression.  (Tr. at 724-725).

claimant's impairments meet or medically equal a disorder included in the Listing. The purpose of the Listing is to describe "for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity." *See* 20 C.F.R. § 404.1525. Because the Listing identifies disorders that are of sufficient severity to merit an irrefutable presumption of disability, "[f]or a claimant to show that his impairment matches a [listed impairment], it must meet *all* of the specified medical criteria." *Sullivan v. Zebley,* 493 U.S. 521, 530 (1990). Similarly, "[f]or a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment . . . A claimant cannot qualify for benefits under the 'equivalency' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Id.* at 531.[10]

Here, the ALJ determined that Claimant's depression and anxiety simply did not meet the specific criteria contained in Listings 12.04 and 12.06. These listings include an introductory paragraph describing the disorder and paragraphs A, B, and C criteria. In order to meet or medically equal either of these listings, a claimant must (1) have an impairment that satisfies the description of the particular disorder contained in the introductory paragraph; (2) document the presence of the disorder through medical findings (paragraph A criteria); and (3) substantiate impairment-related functional

---

[10] In *Sullivan,* the Supreme Court explained the equivalency concept by using Down's syndrome as an example. Down's syndrome is "a congenital disorder usually manifested by mental retardation, skeletal deformity, and cardiovascular and digestive problems." *Id.* At the time of the *Sullivan* decision, Down's syndrome was not an impairment included in the Listing. Accordingly, in order to prove medical equivalency to a listed impairment, a claimant with Down's syndrome had to select the single listing that most resembled his condition and then demonstrate fulfillment of the criteria associated with that listing.

limitations that are incompatible with the ability to do any gainful activity (paragraph B or paragraph C criteria).  The level of severity for Listings 12.04 and 12.06 is met when the criteria outlined in both paragraph A and paragraph B are satisfied, or in the alternative, when the requirements of paragraph C are satisfied.  *Id.* §§ 12.00, 12.04, 12.06.   The ALJ must compare a claimant's condition to the criteria contained in paragraphs A and B and consider paragraph C criteria only when paragraph B criteria are not met.  *Id.* §§ 12.00.

Listing 12.04 concerns affective disorders "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome" in which "[m]ood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation."  *Id.*  § 12.04. Listing 12.06 concerns anxiety-related disorders in which  "anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders."  *Id.* § 12.06.   In this case, the ALJ accepted that Claimant met the introductory paragraphs and paragraph A criteria of Listings 12.04 and 12.06.   The ALJ then thoroughly considered the paragraph B criteria.[11]  He found that Claimant had only a mild restriction in activities of daily living, noting that Claimant reported that he cooked, swept, washed laundry, and used his

---

[11] The paragraph B criteria for both disorders is the same and is met when the claimant's disorder results in two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04(B), 12.06(B). *Marked* is defined as "more than moderate but less than extreme;" it "may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." *Id.* § 12.00(C). The term *repeated episodes of decompensation, each of extended duration* generally "means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." *Id.* § 12.00(C)(4).

riding lawnmower. (Tr. at 721). He found that Claimant had moderate difficulties in social functioning, as Claimant reported that he visited his niece, attended church regularly, shopped with his girlfriend, and visited his brother weekly; however, he reported periods of irritability and anger that impaired his ability to socialize. (*Id.*). With regard to concentration, persistence, or pace, the ALJ noted that he gave Claimant the benefit of the doubt in finding that he had a moderate restriction; a consultative psychologist opined that he had moderately deficient concentration, but had good persistence, stayed on task, and remained focused. (*Id.*). Finally, Claimant had no repeated episodes of decompensation of extended duration. (*Id.*).

The agency consultant, Dr. Cohen, opined that Claimant's activities of daily living were mildly impaired; his social functioning was moderately impaired; his concentration, persistence, and pace were moderately impaired; and he had only one or two episodes of deterioration or decompensation for extended periods of time. (Tr. at 463). In the same areas of functioning, Dr. Tessnear found that Claimant was mild, mild to moderate, and mild; she also found no evidence of repeated episodes of decompensation. (Tr. at 781-782). Therefore, the ALJ's findings were consistent with Dr. Cohen's opinion and even more generous in Claimant's favor than Dr. Tessnear's findings. No evidence appears in the record to support a conclusion that Claimant had marked restrictions in any of the functional categories or that he experienced repeated episodes of decompensation of extended duration. Therefore, the ALJ correctly assessed that Claimant's mental impairments did not satisfy the paragraph B criteria of either Listing.

Upon determining that Claimant did not satisfy the paragraph B criteria, the ALJ

appropriately analyzed the applicability of paragraph C criteria.[12] Although the ALJ's discussion of paragraph C criteria is not extensive, his opinion contains a full recitation of Claimant's daily activities, psychiatric history, social and work history, all of which categorically weigh against a finding of disability under the paragraph C criteria. In addition, both Drs. Cohen and Tessnear reached the same conclusion. (Tr. at 463 and 782).   Accordingly, the Court finds that the ALJ's decision that Claimant's impairments did not meet or equal Listings 12.04 and 12.06 is supported by substantial evidence.

Turning to the final relevant Listing, the Court observes that the structure for Listing 12.05 (Mental Retardation) differs from that of the other listed mental disorders, requiring the ALJ to employ a slightly different analytical process. *Id.* § 12.00. "Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation.   It also contains four sets of criteria (paragraphs A through D).   If [a claimant's] impairment satisfies the diagnostic description in the introductory paragraph and anyone of the four sets of criteria, [the SSA] will find [the] impairment meets the listing." *Id.* § 12.00. The diagnostic description for Listing 12.05 is as follows: "[S]ignificantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22."   In order to verify

---

[12] "Paragraph C" of Listing 12.04 is met by "[m]edically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: 1. Repeated episodes of decompensation, each of extended duration; or 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(C). "Paragraph C" of Listing 12.06 is met when the disorder results "in complete inability to function independently outside the area of one's home." *Id.* § 12.06(C).

that he or she has the disorder of mental retardation, a claimant must produce evidence substantiating the diagnostic description. Once the existence of the disorder is established, the level of severity is met when the requirements of paragraph A, B, C, or D are satisfied.

> In this case, the ALJ eliminated Listing 12.05, stating:

> [T]he treating and examining physicians' reports show the claimant did not have a mental incapacity with dependence on others for personal needs and inability to follow directions and did not have sufficient IQ scores to demonstrate such a mental impairment as is required of the Listing at Section 12.05.

(Tr. at 722). The Court finds three deficiencies with this written explanation. First, the ALJ did not expressly identify the evidence (or lack of evidence) that supported his determination that Claimant's intellectual impairment neither met nor equaled the Listing. Second, the ALJ failed to acknowledge that Claimant's verbal IQ score of 70 fell within the parameters of Listing 12.05(C) and (D); thereby, warranting a more complete discussion than that included in the ALJ's decision.[13] Lastly, the ALJ failed to directly address the diagnostic description, which requires evidence of significantly subaverage general intelligence coupled with deficits in adaptive functioning that emerge during the claimant's developmental stage. Nonetheless, the Court finds that the ALJ's ultimate conclusion that Claimant did not meet Listing 12.05 is overwhelmingly supported by substantial evidence. Although the ALJ's failure to "consider all relevant evidence," to indicate "explicitly that such evidence has been weighed ... [and] its weight," and to articulate "the reasons underlying his actions ..." would normally require remand for a reevaluation of this issue, the Court maintains that remand would add nothing to the

---

[13] Again, the Court acknowledges that the ALJ did address this IQ score in his prior written decision, commenting that he realized the score fell within the numerical range outlined in 12.05, but discounted the significance of the score and agreed with the experts reports of their interpretation of the score. (Tr. at 384).

case and would be an inefficient use of judicial time and resources since the result on remand would undoubtedly be the same. *See Mickles v. Shalala,* 29 F.3d 918, 921 (4th Cir.1994) (affirming decision despite error "because there is no question but that [the ALJ] would have reached the same result notwithstanding his initial error"); *see also, Senne v. Apfel,* 198 F.3d 1065, 1067 (8th Cir.1999) ("a deficiency in opinion-writing is not a sufficient reason for setting aside an administrative finding where the deficiency had no practical effect on the outcome of the case."). Therefore, the Court holds that the ALJ's failure to fully explain his Listing 12.05 finding in the written decision was harmless error that neither prejudiced Plaintiff, nor cast into doubt the propriety of the ALJ's decision.[14] As such, the procedural deficiencies apparent in the ALJ's written decision do not justify a remand.

To explain its ruling, the Court analyzes the evidence of record against the criteria of Listing 12.05.  Inasmuch as certain paragraphs of the Listing contain severity criteria clearly inapposite to Claimant's documented intellectual impairment, those paragraphs can be disregarded as inapplicable. The ALJ, in fact, began this process by comparing Claimant's impairments to the severity criteria contained in paragraphs A and B of Listing 12.05, determining that Claimant did not meet them.  The Court agrees with these conclusions. Paragraph A requires a "[m]ental incapacity evidenced by

---

[14] The harmless-error analysis is often applied in the context of Social Security actions.  One illustrative case provides: "Procedural perfection in administrative proceedings is not required. This court will not vacate a judgment unless the substantial rights of a party have been affected." *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988). The procedural improprieties alleged by Morris will therefore constitute a basis for remand only if such improprieties would cast into doubt the existence of substantial evidence to support the ALJ's decision. *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988); *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result."). Our Court of Appeals, in a number of unpublished decisions, has taken the same approach.  *See, e.g., Bishop v. Barnhart*, No. 03-1657, 2003 WL 22383983, *1 (4th Cir. Oct 20, 2003); *Camp v. Massanari*, No. 01-1924, 2001 WL 1658913, *1 (4th Cir. Dec 27, 2001); *Spencer v. Chater*, No. 95-2171, 1996 WL 36907, *1 (4th Cir. Jan. 31, 1996).

dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded." *Id.* § 12.06(A). Nothing in the record suggests that Claimant ever displayed this level of dependence.  In fact, the evidence is to the contrary.  Claimant completed the ninth grade in school with passing grades, as well as vocational training in arc welding.  He married and worked as a mechanic on heavy equipment for many years.  His work record was excellent.  (Tr. at 240).  He was independent in his daily hygiene and grooming, drove, cooked, did laundry, and lived on his own for a period after his divorce.  He was found competent to manage his own finances.  (Tr. at 368).  His intellectual capacity to care for himself was never questioned by any of his treating physicians or psychiatrists, and when his IQ was measured, Claimant was able to complete standardized testing.  Similarly, the results of those tests ruled out the applicability of paragraph B of the Listing, which requires a valid verbal, performance, or full scale IQ of 59 or less.  Claimant's lowest score was 70 and his highest score was 85, significantly higher than the requisite paragraph B criteria. Accordingly, the Court finds that substantial evidence supports the ALJ's rejection of Listing 12.05(A) and (B).

Examining the remaining severity criteria of the Listing, the Court notes that Claimant's impairments also do not meet or equal the requirements of paragraph D. "Paragraph D contains the same functional criteria that are required under paragraph B of the other mental disorders listings." § 12.00(A).  Although the ALJ did not explicitly discuss paragraph D criteria in the context of his 12.05 analysis, his decision otherwise contained a thorough appraisal of paragraph B criteria in conjunction with his review of Listings 12.04 and 12.06.  (Tr. at 721, 724-725).  Paragraph D of Listing 12.05 is met

when the claimant has an IQ score of 60 through 70 and at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social function; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. *Id.* § 12.05(D).   As discussed *supra*, two consulting psychologists analyzed Claimant's impairments under paragraph B criteria and concluded that he showed no evidence of marked limitations and no repeated episodes of decompensation. These opinions were confirmed by a consulting psychiatrist, who opined that Claimant did not meet paragraph B criteria. (Tr. at 463).   The ALJ examined these opinions in detail and compared them to a symptom activity checklist completed at Prestera, which documented Claimant to have no symptoms in 29 mental health categories, "mild" symptoms in six categories, and "moderate" symptoms in the remaining six categories.  However, "in no areas was the claimant 'severe' or 'acute.'"  (Tr. at 725).  The ALJ also considered the letters written by Claimant's treating psychiatrists, who opined that Claimant was unable to work.  The ALJ observed that these opinions were at odds with the psychiatrists' own treatment records, which did not corroborate the existence of serious limitations, stating:

> The undersigned notes that the treatment records from Prestera showed only mild clinical findings with full orientation; mood was depressed at times and noted as calm at other times; with congruent affect, and clear, goal directed speech (Exhibit 10F).   Further, other medical evidence showed full orientation, fair insight, mildly depressed mood, mildly flat affect, moderately deficient judgment, normal memory, normal persistence and pace, and moderately deficient concentration (Exhibit 9F). As a result, the undersigned gives little weight to the opinion of the treating physicians as inconsistent with the clinical picture.

(Tr. at 724).  Therefore, the Court finds that the implicit conclusion of the ALJ that Claimant's impairments did not meet or equal Listing 12.05(D) is supported by substantial evidence.

After determining the inapplicability of three of the four paragraphs of Listing 12.05, the Court lastly examines paragraph C.  Listing 12.05(C) is met by satisfying the following three factors: (1) the diagnostic description contained in the introductory paragraph; (2) "[a] valid verbal, performance, or full scale IQ of 60 through 70;" and (3) "a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Id.* §12.05(C).   Considering first the severity criteria contained in the second and third factors, the Court acknowledges that a persuasive argument exists that Claimant's impairments met or equaled that criteria. However, when addressing the final factor—the diagnostic description—the Court concludes that Plaintiff has failed to offer evidence or argument sufficient to support a conclusion that Claimant's mental deficiencies met or equaled the diagnostic description contained in the introductory paragraph.  Consequently, Plaintiff cannot meet her burden of proof to support a presumptive finding of disability based upon Listing 12.05(C).  The Court explains its analysis as follows.

In 2004, at the request of the SSA, Claimant underwent intelligence testing as part of a comprehensive psychological evaluation.  The record reflects that Claimant received a verbal IQ score of 70 on a WAIS-III examination which the examiner, Dr. Frederick, deemed to be valid. (Tr. at 367). A verbal IQ score of 70 falls within the parameters contained in Listing 12.05(C).  *Id* § 12.05(C) ("A valid verbal, performance, or full scale IQ of 60 to 70…").   Therefore, on the basis of this single IQ score, Claimant potentially fulfilled the second factor of 12.05(C).

In general, the results obtained by a licensed psychologist following administration of accepted intelligence tests are entitled to considerable weight in Social Security cases, although the Commissioner is not required to accept such scores. *See*

26

*Clark v. Apfel,* 141 F.3d 1253, 1255 (8th Cir. 1998); See also, *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 1996); *Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir. 1988); *Foster v. Heckler,* 780 F.2d 1125, 1130 (4th Cir. 1986). The Commissioner may reject IQ scores if they are inconsistent with other substantial evidence in the record, such as conflicting professional opinions or other documentary evidence indicating that the claimant historically achieved higher scores or has more advanced functional capacities than would be expected from someone with a below-average I.Q. *Clark*, 141 F.3d at 1255; *Markle v. Barnhart,* 324 F.3d 182, 186 (3d Cir. 2003); *see* 20 C.F.R. § 404.1527(d)(2). Indeed, IQ test results must be examined "to assure consistency with daily activities and behavior." *Popp v. Heckler,* 779 F.2d 1497, 1499 (11th Cir. 1986).   When an ALJ ignores or rejects an otherwise valid IQ score, the question for the Court is "whether the decision to disregard the scores as unreliable is supported by substantial evidence from the record as a whole." *Poque v. Astrue,* 692 F. Supp.2d 1088 (E.D. Mo. 2010).   Section 12.00(D)(6) of the Listing explains the use of intelligence testing in verifying mental retardation, emphasizing that "since the results of intelligence tests are only part of the overall assessment, the narrative report that accompanies the test results should comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation." *Id.* at § 12.00(D)(6)(a). Here, Dr. Frederick administered the intelligence test to Claimant and found his verbal IQ score to be 70, while his performance IQ score was 85.   Dr. Frederick noted the discrepancy between the scores and commented that the difference "is indicative of poor education."   Dr. Frederick interpreted the scores to be valid, but opined that they were demonstrative of borderline intellectual functioning, not mental retardation.   (Tr. at 365-368).   This judgment is consistent with the evidence of record and the opinions of

two other mental health specialists.

However, assuming *arguendo,* that Claimant's IQ of 70 is a reliable reflection of his innate intelligence, he meets the numerical criteria of 12.05(C); accordingly, the third factor must be considered.  Claimant satisfies this factor, because he undeniably suffers from "a physical or other mental impairment imposing additional and significant work-related limitation of function."  The ALJ found at step two of the sequential analysis that Claimant had numerous severe impairments and could not return to his past relevant work. If a claimant has even a single physical or mental impairment in addition to mental retardation that qualifies as "severe," then that impairment is considered a significant work-related limitation under listing 12.05(C). *Luckey v. U.S. Dept. of Health & Human Services*, 890 F.2d 666, 669 (4th Cir.1989).  The ALJ found that Claimant suffered from the severe impairments of low back and neck pain; diabetes mellitus; obesity; hypertension; shortness of breath; depression; and anxiety, in addition to borderline intellectual functioning. (Tr. at 720, Finding No. 3). Furthermore, the ALJ concluded that Claimant could not return to his past relevant work as a diesel mechanic and truck driver. (Tr. at 726, Finding No. 6). In this Circuit, if a claimant cannot return to his past relevant work, he has established a work-related functional limitation that meets the requirements of § 12.05(C). *Branham v. Heckler,* 775 F.2d 1271, 1273 (4th Cir. 1985).

Conceding that Claimant potentially met the severity level of paragraph C, the only remaining inquiry with regard to Listing 12.05(C) is whether Claimant's impairments satisfied the introductory diagnostic description; that being "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period." *Id.* § 12.05.  These terms are not explicitly

defined in 12.05; however, "adaptive activities" are described elsewhere in the Listing as "[a]ctivities of daily living" such as "cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office." *Id.* § 12.00(C)(1). Additionally, the Diagnostic and Statistical Manual of Mental Disorders Fourth Edition ("DSM-IV") defines adaptive functioning as how effectively an individual copes with common life demands and how well he or she meets the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting.[15]

In his written decision, the ALJ discussed many areas of Claimant's adaptive functioning when examining the paragraph B criteria of Listings 12.04 and 12.06. As previously stated, he noted that Claimant cooked, swept, washed laundry, used a riding mower, visited his niece and brother, and shopped with his girlfriend. (Tr. at 721). Further, in determining Claimant's RFC, the ALJ commented that, to the extent his physical limitations allowed, Claimant performed household chores, such as taking out the garbage, and could dress and bathe himself. (Tr. at 723). Claimant also had a driver's license, could read a simple grocery list, could make change, had vocational training in arc welding, and worked as a mechanic on heavy equipment and coal trucks. (*Id.*).

The Court's independent review of the evidence further confirms that Claimant failed to produce any evidence corroborating deficits in adaptive functioning that were present during his developmental period (prior to age 22). To the contrary, the evidence of record refutes such a conclusion. The evidence of Claimant's adaptive behavior

---

[15] The Court includes the diagnostic criteria of DSM-IV as an additional framework to assess Claimant's adaptive functioning under Listing 12.05. The DSM-IV is a publication of the American Psychiatric Association and is recognized as an authoritative source in the specialty of psychiatry.

during adulthood demonstrates average functioning, without any notable deficiencies related to intellectual abilities and, thus, by inference validates Claimant's lifelong ability to cope with common daily challenges and maintain individual independence. The record establishes that Claimant was an accomplished, albeit self-taught, large equipment mechanic. (Tr. at 251 and 306). Claimant had significant work experience fixing heavy diesel trucks, large tow trucks, and bulldozers. (Tr. at 306). He also drove an 18-wheel coal truck and an end loader. (Tr. at 306). All of his past employment positions were rated as either skilled or semi-skilled labor. Claimant maintained an excellent work record for decades. Although uneducated, Claimant had earnings 29 out of 32 years, making as much as $35,000 in 1988 (at age 36). (Tr. at 794). Claimant married twice, separated from his second wife, and lived with his girlfriend of four years; indicating an ability to maintain significant social relationships. (Tr. at 302). While married, he was self-sufficient in his grooming and hygiene; his only restrictions were a result of physical limitations. (Tr. at 247). Claimant also lived alone in a trailer for a period of time and while living alone, he took care of his home and yard; he used a riding lawn mower; visited family and friends on a regular basis; attended church services; cooked for himself; vacuumed and did laundry. (Tr. at 320, 365 and 368). His hobbies included woodworking and mechanics, both of which were later curtailed due to Claimant's physical complaints, not his mental limitations. (*Id.*). He quit school after the ninth grade only because he "just didn't want to go anymore," but while in school, he received a regular classroom education and obtained passing grades. (Tr. at 366).

Equally as important, Claimant's medical and psychiatric records are void of notations by his treating physicians and mental health providers suggesting questions or concerns related to Claimant's intellectual functioning. "Mental retardation" was never

included as a differential diagnosis in any treatment record, nor was suspected or pursued by any of these specialists. When specifically addressing Claimant's obstacles to employment, Dr. Rana, Claimant's treating psychiatrist, mentioned only Claimant's major depression, which Dr. Rana believed had an onset date that corresponded to the physical injury that caused Claimant to quit working. (Tr. at 708). Neither Dr. Rana, nor any other member of the Prestera staff, documented that Claimant displayed signs or symptoms of mental retardation or other significant impairment in intellectual functioning, although they conducted several comprehensive evaluations of Claimant and regularly counseled with him. (*Id.*). Claimant's testimony corroborated a lack of adaptive deficits in his childhood; he confirmed that he did not have any "mental problems" prior to hurting his back. (Tr. at 319). In regard to Claimant's scores on the WAIS-III test, both Dr. Frederick and Dr. Tessnear reasoned that Claimant's intellectual limitations were appropriately assessed as borderline intellectual functioning, rather than mild mental retardation, due to the significant variance in his verbal and performance IQ scores. (Tr. at 782). Dr. Tessnear also commented on the effect of Claimant's borderline intelligence on his ability to perform everyday tasks, opining that its impact was "mild." (*Id.*)

Moreover, Claimant never raised his lack of intelligence as a basis for disability benefits. On November 18, 1999, Claimant completed a Disability Report Adult form, setting out the reasons for his inability to work. (Tr. at 58-67). Claimant did not report any deficits in intellectual functioning. On November 30, 1999, Claimant was interviewed over the telephone by a SSA field office representative, who documented that Claimant had no difficulties with understanding, coherency, talking, answering, or concentrating. (Tr. at 70). During his first administrative hearing, on May 18, 2001,

31

Claimant clearly understood all of the questions addressed to him and answered the questions fully and articulately.  (Tr. at 237-270).  He reported no difficulties with comprehension or learning. He was able to chronicle his medical background, even specifying the numerical measurements of his serial blood pressures and the dosages of his medications.  *Id.*

At the second administrative hearing, the ALJ[16]  questioned Claimant extensively about his ability to independently complete activities of daily life.  (Tr. 300-327).  In response to this questioning, Claimant testified that he had few difficulties in accomplishing everyday tasks, and when he did discuss limitations, they were generally attributed to his physical impairments. In the subsequent written decision, the ALJ commented on Claimant's IQ score of 70, acknowledging that while that number fell within the range of 12.05, the psychological evaluator believed that Claimant had borderline intelligence, an opinion that was seconded by the psychiatric medical expert, Dr. Cohen.  (Tr. at 284 and 457-459).  Obviously, in that particular decision, the ALJ explicitly considered paragraph C of the Listing and found that Claimant did not meet the stated criteria. In reaching that conclusion, the ALJ expressly relied upon the opinions of a consulting psychologist and a psychiatrist, who determined that Claimant's adaptive and functional abilities did not correspond with the diagnostic description of mental retardation.

By the third administrative hearing, Claimant was deceased.  However, his attorney presented an opening statement, during which he raised Claimant's IQ score of 70 and discussed the applicability of 12.05(C).  (Tr. at 794).  The ALJ took a short recess

---

[16] The Honorable William Gitlow was the ALJ in both the second and third administrative hearings and wrote the last two decisions.  Accordingly, when considering the issues in this case, Judge Gitlow had the benefit of prior contacts with Claimant, as well as the earlier written opinions and the historical documentary evidence.

to consider the issues raised by Claimant's attorney.  The ALJ then presented a detailed hypothetical question to the vocational expert that included a statement of Claimant's RFC, which comprehensively set out Claimant's level of education, reading and math levels as determined by the psychological testing, and other work-related limitations arising from Claimant's depression, anxiety, and borderline intelligence.  Taking this RFC into consideration, the vocational expert identified sedentary, unskilled jobs that Claimant could perform during the relevant time period.  (Tr. at 799-804).

Therefore, while the Court acknowledges that the ALJ's discussion of Listing 12.00, particularly Listing12.05(C), was deficient, the Court finds this to be harmless error.  The ALJ's ultimate conclusion that Claimant did not satisfy the criteria of any listed mental disorder is supported by substantial evidence. Thus, remand on this issue is not warranted.

### B.  <u>Credibility</u>

Plaintiff next argues that the ALJ erred in finding that Claimant's testimony was "less than good." (Pl.'s Br. at 7). The Court finds Claimant's argument unpersuasive.

Social Security Ruling 96-7p clarifies the two-step process by which the ALJ must evaluate symptoms, including pain, to determine their limiting effects on a claimant. *See, also* 20 C.F.R. §§ 404.1529 and 416.929.  First, the ALJ must establish whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms.  SSR 96-7P.  Once the ALJ finds that the conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* Whenever the intensity, persistence or severity of the symptoms cannot be established

by objective medical evidence, the ALJ must assess the credibility of any statements made by the claimant to support the alleged disabling effects. The Ruling sets forth the factors that the ALJ must consider in assessing the claimant's credibility, emphasizing the importance of explaining the reasons supporting the credibility determination. The Ruling further directs that the credibility determination must be based on a consideration of all of the evidence in the case record. *Id.*

When evaluating whether an ALJ's credibility determinations are supported by substantial evidence, the Court does not simply replace its own *de novo* credibility assessments for those of the ALJ; rather, the Court must review the evidence to determine if it is sufficient to support the ALJ's conclusions. "In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence . . . or substitute its own judgment for that of the Commissioner." *See Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990). Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler,* 739 F.2d 987, 989-990 (4th Cir. 1984), citing *Tyler v. Weinberger*, 409 F. Supp. 776 (E.D.Va. 1976).

Here, the Court finds that the ALJ's credibility assessment of Claimant was consistent with the applicable regulations, case law, and Social Security Ruling and was supported by substantial evidence. 20 C.F.R. § 404.1529; SSR 96-7p; *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 1996). The ALJ found that Claimant's statements concerning the intensity, persistence, and limiting effects of his symptoms were not credible to the extent that they were inconsistent with the RFC assessment. (Tr. at 723). As the ALJ noted, Claimant advised his treating psychiatrist that he was socially withdrawn, yet reported that he attended church, visited family, and went shopping with his girlfriend.

(*Id.*). Further, Claimant received conservative treatment for his depression and refused inpatient treatment. (*Id.*). Therefore, the ALJ concluded that Claimant's allegations of disabling mental impairments were excessive and not fully credible. (*Id.*).

Treatment records from the relevant time period support the ALJ's findings that Claimant's allegations were not credible to the extent that they contend disabling mental impairments. Claimant responded very well to treatment for his depression and anxiety at Prestera. On August 2, 2001, he was considered stable; his hostility and irritability appeared to have decreased, his mood appeared euthymic, and he reported improvement in sleep. (Tr. at 448). On September 27, 2001, he was feeling anxious and depressed, but was "doing good." (Tr. at 447). On November 21, 2001, he was "ok," but his dosage of Prozac was increased in light of his depressive symptoms. (Tr. at 445). In December 2001 through early January 2002, Claimant's mental condition seemed to decline; he was feeling depressed and reportedly took an overdose of medication. (Tr. at 600, 444, 441). However, by January 29, 2002, Claimant stated that he was feeling better since separating from his wife and moving out of his house and that he had not felt happy like that for a long time. (Tr. at 436). His mood was calm and his affect much brighter as compared to his previous session; he was looking forward to his life and did not want to go back to his wife. (*Id.*). On the final day of the relevant period, the day before his fiftieth birthday, Claimant reported that he was feeling better since he was "started back" on Prozac. (Tr. at 435). He had improved energy levels, no suicidal thoughts, and was less depressed. (*Id.*). Treatment records fail to substantiate the existence of disabling mental impairments.  Instead, as pointed out by Dr. Tessnear, the records demonstrate situational depression that was alleviated by a beneficial change of circumstance.

Having examined the ALJ's decision and the evidence in its totality, the Court finds that the ALJ thoroughly considered Claimant's complaints of pain and psychological distress, conducted a reasoned review of the evidence, and adequately explained the grounds underlying his credibility determination. Consequently, the ALJ's ultimate finding on this issue has substantial evidentiary support.

## C.   **Opinion Evidence**

Plaintiff's final assertion of error argues that the ALJ "gave no rational reason" for disregarding the conclusions of Claimant's treating psychiatrists, Drs. Rana and Khan, who stated that Claimant was disabled due to depression and anxiety. (Pl.'s Br. at 7). Plaintiff further contends that the ALJ "attempted to usurp the findings of the Claimant's treating psychiatrists by citing Interrogatory responses from a non-examining medical expert" who rendered an opinion five years after Claimant's alleged onset date and "[t]o add insult to injury, the Administrative Law Judge also relied on the opinion of a non-examining consultative clinical psychologist who reviewed the cold file" nine months after Claimant's alleged onset date. (Pl.'s Br. at 10).

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *See* 20 C.F.R. § 404.1527(d)(2). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." *Ward v. Chater*, 924 F. Supp. 53, 55 (W.D. Va. 1996); *see also*, 20 C.F.R. § 404.1527(d)(2). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits.   20 C.F.R. §§ 404.1527(d)(2).

36

Ultimately, it is the responsibility of the Commissioner, not the court, to review the case, make findings of fact, and resolve conflicts of evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).   The Court need only review the record as a whole and corroborate that the Commissioner's conclusions are rational and based upon substantial evidence.

In this case, ALJ considered the letters from Drs. Rana and Khan which stated that Claimant could not maintain employment. However, the ALJ noted that Claimant's treatment records from Prestera showed only mild clinical findings with full orientation; that his mood was depressed at times and calm at other times; and that he expressed congruent affect and clear, goal directed speech. (Tr. at 724). In addition, the ALJ pointed out that other medical evidence showed full orientation, fair insight, mildly depressed mood, mildly flat affect, moderately deficient judgment, normal memory, normal persistence and pace, and moderately deficient concentration. (*Id.*). As a result, the ALJ gave little weight to the opinions of Claimant's treating psychiatrists as inconsistent with the clinical picture. (*Id.*).

The Court disagrees with Plaintiff's contention that the foregoing explanation provided by the ALJ was not a "rational reason" for affording little weight to the opinions of Drs. Rana and Khan. Their conclusions that Claimant was not capable of gainful employment due to depression and anxiety, and their associated symptoms, lack evidentiary support and are, in fact, inconsistent with their own treatment records and Claimant's testimony. As mentioned in the preceding sections, Claimant performed a variety of activities including attending church, visiting his family, and driving to the post office and store. He also maintained his hygiene and performed household chores, including cooking, sweeping, washing laundry, and mowing his lawn. Although

Claimant's mental status may have interfered with his functioning to some extent, it certainly did not prevent him from engaging in any of the foregoing activities. In addition, his treatment records reflect that his depression, sleeping difficulties, irritability, and other symptoms greatly improved with medication and psychiatric treatment. (*See, e.g.,* Tr. at 448, 436, 435).

Furthermore, the ALJ fully articulated his rationale in adopting the opinions of non-examining sources, Drs. Cohen and Tessnear. The ALJ recounted that in light of the conflict between the disabling conclusions of Claimant's treating psychiatrists and the modest assessment of Dr. Frederick, the ALJ sent the entire file to Dr. Cohen who concluded that Claimant's depression, anxiety, and borderline IQ were mild to moderate in degree. (Tr. at 724-725). The ALJ found Dr. Cohen's opinion to be reasonable and consistent with the weight of the medical evidence. (Tr. at 725). Further, Dr. Tessnear's opinion concurred with that of Dr. Cohen. (*Id.*). Dr. Tessnear found that Claimant's depression was reactive to stressful live events such as back pain, unemployment, and martial discord, but that after Claimant left his wife, his mood improved. (*Id.*). Also, his medication was at a relatively low dose for the treatment of depression and treatment notes reflected a mild level of depression that was showing improvement with increased energy, all of which conflicted with his treating psychiatrists' letters stating that Claimant could not work due to severe depression. (*Id.*). The ALJ found Dr. Tessnear's opinion to be thorough in its analysis and that her conclusions were consistent with the weight of the objective evidence; further, her opinion was consistent with Claimant's conservative treatment of therapy and prescription medications. (Tr. at 726).

The Court finds no error in the ALJ's decision to afford little weight to the opinions of Claimant's treating psychiatrists and to adopt the findings the non-

examining medical sources. Unlike the unsubstantiated opinions of Drs. Rana and Khan that Claimant was incapable of substantial gainful activity, the opinions of Drs. Cohen and Tessnear were consistent with the medical evidence discussed at length in preceding sections of this Opinion. Therefore, based on all of the above, the Court finds that the ALJ's treatment of the medical opinions was supported by substantial evidence.

## VIII.  Conclusion

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Therefore, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to all counsel of record.

**ENTERED:**  June 17, 2011.

Cheryl A.  Eifert
United States Magistrate Judge